USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:   06/23/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
AIDA ALTRAGRACIA NUNEZ GARCIA,                       :
                                                     :
                    Plaintiff,                       :          **OPINION &**
                                                     :          **ORDER**
-v-                                                  :
                                                     :          22-CV-4602 (JLC)
                                                     :
ACTING COMMISSIONER                                  :
OF SOCIAL SECURITY,[1]                               :
                                                     :
                    Defendant.                       :
                                                     :
-------------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Aida Altragracia Nunez Garcia ("Garcia") seeks judicial review of a

final determination made by defendant Kilolo Kijakazi, the Acting Commissioner of

the Social Security Administration ("the Commissioner"), denying her application

for supplemental security income under the Social Security Act.[2]  The parties have

cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  For the reasons set forth below, Garcia's motion is

granted, and the Commissioner's cross-motion is denied.

---

[1] Kilolo Kijakazi is now the Acting Commissioner of the Social Security
Administration.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the
Acting Commissioner is substituted for the Commissioner as the defendant in this
action.

[2] During the hearing, the ALJ referred to Plaintiff as both Nunez Garcia and
Garcia.  Similarly, Plaintiff is referred to as Nunez, Nunez Garcia, and Garcia
throughout the Administrative Record.  Because Plaintiff refers to herself as Garcia
in her motion papers, the Court will do the same.

# I. BACKGROUND

## A. Procedural History

Garcia filed an application for Supplemental Security Income ("SSI") on July 8, 2020. Administrative Record ("AR"), Dkt. No. 14, at 17, 64–66.[3] For the purposes of this motion, Garcia's alleged onset date is July 8, 2020.[4] The Social Security Administration ("SSA") initially denied Garcia's claims on December 23, 2020, and upon reconsideration on May 4, 2021. *Id.* at 17. Garcia requested a hearing before an Administrative Law Judge ("ALJ") on June 22, 2021. *Id.* On September 24, 2021, Garcia appeared by telephone, represented by counsel, before ALJ Angela Banks; a vocational expert ("VE") testified at this hearing as well. *Id.* at 41–43. ALJ Banks denied Garcia's application on March 1, 2022. *Id.* at 17–26. Garcia then filed a request to review the decision with the Appeals Council. *Id.* at 1. On May 11, 2022, the Appeals Council denied Garcia's request. *Id.*

Garcia timely commenced this action on June 3, 2022, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). Complaint ("Compl."), Dkt. No. 1. The Commissioner answered Garcia's complaint by filing the administrative record on October 11, 2022. Dkt. No. 14. On February

---

[3] The page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing ("ECF") System.

[4] Garcia's application filed on July 8, 2020 alleged a disability onset date of January 1, 2010. AR at 17. As Garcia notes in her motion papers, because this is an SSI only application, the earliest she can be eligible for SSI benefits is the month after the date of her application. 20 C.F.R. § 416.335.; Pl. Mem. at 1 n.2; Def. Mem. at 4 n.2 (citations omitted).

8, 2023, Garcia moved for judgment on the pleadings and submitted a memorandum of law in support of her motion. Notice of Motion, Dkt. No. 19; Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 20. The Commissioner also cross-moved for judgment on the pleadings on April 5, 2023, and submitted a memorandum in support of her motion. Notice of Cross-Motion, Dkt. No. 24; Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings ("Def. Mem."), Dkt. No. 25. On May 1, 2023, Garcia submitted reply papers. Reply Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Reply"), Dkt. No. 28.

The parties have consented to my jurisdiction. Dkt. No. 26.

### B. The Administrative Record

#### 1. Garcia's Background

Garcia was born on February 4, 1969. AR at 47. She was 51 years old when she filed her applications (and thus 51 on her alleged disability onset date), and 53 years old on the date of the ALJ decision. *Id.* at 1, 11, 17, 47, 65, 187. She was living in the Bronx at the time of the ALJ decision. *See, e.g., id.* at 33. Garcia has a limited tenth-grade education, *id.* at 25, 78, and has no work history in the last 15 years. *Id.* at 232.[5] Garcia can speak, read, write, and understand Spanish, but not English, per her Adult Function Report. *Id.* at 205.

---

[5] Per her Work History Report, Garcia's last employment was at a factory from 1993 to 1995, in which her responses state that she sat for eight hours of her nine-hour workday and was not permitted to lift objects weighing more than ten pounds. AR at 232–33.

Since at least January 2013, Garcia has been diagnosed with bipolar disorder and panic attacks. *Id.* at 486–94.[6] Medical records from 2013 indicate that she presented with "anxious/fearful thoughts, decreased need for sleep, depressed mood, difficulty concentrating, . . . falling asleep, . . . staying asleep, fatigue and paranoia." *Id.* Later that same year, Garcia was diagnosed with depression and anxiety by Drs. Arcangelo Lubrano (her treating psychiatrist) and Carl St. Preaux at La Casa De Salud ("Casa De Salud"). AR at 503, 518.

In or around 2015, Garcia's daughter died by suicide. *See e.g., id.* at 618, 755. Garcia's treating physicians at Casa De Salud reported that she "continues to present back flashes [*sic*] and hears the ring of the [door]bell the night police arrived at her house to inform her [that] her [daughter] had jumped from the balcony and killed herself after she found her husband in her apartment with another woman in her bed." *Id.* at 618. Garcia's treatment plan includes monthly visits for medication management and psychotherapy. *See, e.g., id.* at 782–85, 807–09.

Beginning in November 2020, Garcia was diagnosed with a long-term form of depression (called "dysthymic" or "persistent depressive disorder"). *Id.* at 814–15. The following month (December 2020), Garcia was diagnosed with "agoraphobia

---

[6] Although the Administrative Record primarily contains medical treatment records from 2013 on (excluding the St. Barnabas Hospital ER records which date back to 2011), Garcia's psychiatric history is likely longer—the January 18, 2013, visit to Casa De Salud is described as "a follow up visit" by the treating physician. AR at 486. Additionally, Garcia has been diagnosed with bipolar disorder as recently as October 2020. *Id.* at 810–13.

with panic disorder." *Id.* at 471–72, 840–41.[7]  At a medication renewal appointment, Dr. Lubrano indicated that Garcia was "absent minded, forgets to take showers and burns herself in the kitchen," and that the "anniversary reaction" to Garcia's daughter's death was approaching.  *Id.* at 444–45.  Dr. Lubrano diagnosed Garcia with "agoraphobia with panic disorder; complicated bereavement, and major depressive disorder, single episode, unspecified."  *Id.*  Garcia has a history of "auditory hallucination[s]"—specifically, "a voice calling her name"—which happen frequently.  *Id.* at 471.

In addition to her continued treatment at Casa de Salud, Garcia has been treated by the St. Barnabas Hospital Emergency Department.  On or around July 9, 2019, Garcia was treated at the St. Barnabas emergency room ("ER") due to right leg pain, which she had reported having for three days.  *Id.* at 946–63.  On or around November 13, 2020, Garcia presented at the St. Barnabas ER for dizziness and was diagnosed with vertigo.  *Id.* at 344–46, 993, 999–1000.  Relevant to this action, Garcia was treated by the St. Barnabas ER staff as recently as August 2021, *id.* at 475–81, during which time she reported having fleeting suicidal ideation earlier in the week but denied wanting to harm herself while in the ER.  *Id.* at 1125.

### 2. Medical Evidence

Garcia has provided a summary of the medical evidence contained in the administrative record.  *See* Pl. Mem. at 3–10.  The Commissioner has adopted

---

[7] Garcia's records indicate that she was again diagnosed with agoraphobia with panic disorder in February and June 2021. AR at 471–72, 882–83.

Garcia's recitation of the relevant facts and underlying proceedings.  *See* Def. Mem. at 6.  The Commissioner has also submitted additional or contrary facts in the briefing of this motion, to which Garcia does not object.  *See id.* at 4–6.  Having examined the record, the Court adopts the parties' summaries as accurate and complete for the purposes of the issues raised in this action.  The Court will discuss the medical evidence pertinent to the adjudication of this case in section II.B below. *See, e.g., Platt v. Comm'r*, No. 20-CV-8382 (GWG), 2022 WL 621974, at *2 (S.D.N.Y. Mar. 3, 2022) (adopting parties' summaries of medical evidence).

### 3. Hearing Before the ALJ

On September 24, 2021, represented by counsel, Garcia appeared before the ALJ by telephone "due to the pandemic."  AR at 31–46.  The hearing was conducted with the assistance of a Spanish-language interpreter.  *Id.* at 33.

During the hearing, Garcia testified that she lived with her then 20-year-old son who assists her with shopping, laundry, and medication management.  *Id.* at 36–37.  Garcia reported that she rarely leaves her home, apart from going to the laundromat and to Western Beef with her son—both of which are near where she lives.  *Id.* at 37–38.[8]  She also testified that she travels by taxi to Casa de Salud because she "get[s] lost on public transportation."  *Id.*  Responding to the ALJ's question of whether she ever socializes with friends, Garcia testified that she "[did] not have friends."  *Id.* at 38.

---

[8] The hearing transcript reads "Western Bit," but the Court believes this was intended to be Western Beef, a warehouse-style supermarket chain in New York, New Jersey, and Florida.

6

The ALJ then asked Garcia questions regarding her mental health.  Garcia
testified that she suffers from hallucinations—she hears hallucinations of her late
daughter and of the doorbell ringing (from when the police came at 1:00 a.m. to
inform her about her daughter's suicide).  *Id.* at 38–39.  Next, Garcia testified that
she experiences memory loss, often forgetting to turn off the stove.  *Id.* at 39.  She
explained that her bipolar depression causes her to "cry every day without anyone
doing anything," that she has back pain, dizziness, and trouble getting out of bed.
*Id.* at 39–40.  Garcia also testified that her prescribed medications make her
"nauseous and want[] to throw up."  *Id.* at 40.

The ALJ next questioned Vocational Expert ("VE") Dale Pasculli.  *Id.* at 41–
42.  Because the "review of the evidence show[ed] . . . no past relevant work," the
ALJ began with a hypothetical: an individual of Garcia's same age, education, and
work experience with no exertional limitations but can (1) perform simple, routine,
and repetitive tasks; (2) perform work in a low stress job with occasional decision-
making, occasional judgment required and occasional changes in a work setting; (3)
perform goal-oriented work but no production rate pace work (*e.g.*, assembly line);
and (4) tolerate occasional contact with coworkers, supervisors, and the public.  *Id.*
at 41.  The VE concluded that, based on these conditions, the hypothetical
individual would be able to perform the positions of cleaner or housekeeper, routing
clerk, or automobile detailer.  *Id.* at 42.  The ALJ then proposed a second
hypothetical adding the additional limitation that a similarly situated individual

would be off task more than 20 percent of an eight-hour workday. *Id.* The VE testified that no such individual would be able to perform any work. *Id.*

In response to questioning by Garcia's attorney, the VE testified that the general limit to which employees would be permitted to be off task was ten percent of the workday or approximately five minutes off per hour. *Id.* at 43. The VE further testified that the tolerance for absences in these positions would be no more than one per month. *Id.* When Garcia's attorney asked how often tardiness would be tolerated "if the person had trouble keeping a schedule," the VE explained that "[i]t would not be tolerated"—"at the most" it would be tolerated "twice a month." *Id.* The VE also noted that while the exact number was employer-dependent, being late "more than one time would become problematic." *Id.*

Finally, in response to counsel's request that the ALJ consider listings 12.4 and 12.05, the ALJ requested underlying treatment records going back to 2013— *i.e.*, when the records indicate that Garcia's condition began. *Id.* at 44–45. The ALJ then similarly requested complete records from Garcia's August 2021 emergency room visit to St. Barnabas, noting that she would not review Garcia's arguments until all records were submitted. *Id.* at 45.

### 4. The ALJ's Decision

On March 1, 2022, the ALJ found that Garcia has not been under a disability, as of July 8, 2020, the date she filed her application. AR at 26. At step one of the five-step inquiry, the ALJ found that Garcia had not engaged in substantial gainful activity since her alleged disability onset date of July 8, 2020. *Id.* at 19. At step

two, the ALJ found that Garcia had the following severe impairments: post-traumatic stress disorder ("PTSD"), anxiety, and depressive disorder.  *Id.*  The ALJ then discussed Garcia's record evidence of weight and cardiac issues but found that (1) because "there was no indication that [Garcia]'s obesity imposed any severe functional limitations," it was non-severe; and (2) as "there was no [record] evidence of any cardiac treatment or diagnosis," there was "no medically determinable impairment."  *Id.*  The ALJ noted that she "considered all of [Garcia's] medically determinable impairments, including those that [were] not severe in assessing [Garcia's] residual functional capacity" ("RFC").  *Id.* at 20.

At step three, the ALJ found that Garcia did not have "an impairment or combination of impairments" that met the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*  In so finding, she relied on physician evaluations from Joshua Goldstein, PsyD., and Dr. Lubrano; medical records; other records relating to "activities of daily living"; and hearing testimony.  *Id.* at 20–21.  Specifically, the ALJ found that Garcia had a "moderate" limitation in (1) understanding, remembering, or applying information; (2) interacting with others; and (3) concentrating, persisting or maintaining pace.  *Id.*  The ALJ also found that she had a "mild" limitation in adapting or managing herself.  *Id.* at 21.  Based on the above lack of "marked" or "extreme" limitations, the ALJ concluded that Garcia did not satisfy the "paragraph B" criteria.  *Id.*  She determined that Garcia did not satisfy the "paragraph C" criteria as there was insufficient evidence to meet the regulatory requirements.  *Id.*

9

At step four, the ALJ found that Garcia "had the residual functional capacity ["RFC"] to perform a full range of work at all exertional levels," with exceptions: Garcia could

> [1] perform simple and repetitive tasks . . . [2] perform work in a low stress job defined as occasional decision-making, occasional judgment required, and occasional changes in the work setting . . . [3] perform work that is goal oriented, but no production rate pace work . . . [and] [4] tolerate occasional contact with co-workers, supervisors, and the public.

*Id.* In so finding, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" in addition to opinion evidence. *Id.* at 21–22.

Addressing Garcia's subjective evidence first—*i.e.*, her hearing testimony and a signed document from 2020 describing her daily activities—the ALJ noted that there were inconsistencies between Garcia's alleged symptoms and her actual routine. *Id.* at 22. For instance, the ALJ noted that Garcia's signed statement indicated that she "sometimes did not get out of bed" and "had become less social," but, in the same document, Garcia indicated that she "cooked, shopped, attended church[,] and looked after her son." *Id.* "After careful consideration of the evidence," the ALJ found that Garcia's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," but that Garcia's "statements concerning the *intensity, persistence, and limiting effects* of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.* (emphasis added). The ALJ concluded that Garcia's "allegations of disabling limitations [were] not consistent with the medical evidence

10

of record," because while "the record support[ed] some limitations," they did not do so "to the extent alleged." *Id.* at 25.

The ALJ then assessed the medical opinion evidence. *Id.* at 22–25. She acknowledged that Garcia "ha[d] a lengthy history of outpatient mental health treatment for many years," *id.* at 22, and noted that these treatment reports included several diagnoses, including bereavement, depression, bipolar disorder, and agoraphobia with panic disorder. *Id.* She also noted that during the relevant period, "while [Garcia's] symptoms [were] reported as severe," her "repeat exams were stable with no evidence of delusions, hallucinations, or suicidal ideations." *Id.* Specifically, the ALJ noted that when she sought treatment in August 2021 at the behest of her psychiatrist, Garcia "nevertheless" "felt well." *Id.* at 23. The ALJ then acknowledged that Garcia "denied suicidal ideation but said she was feeling 'fine now'" and that she was "alert, fully oriented, followed commands, . . . logical with appropriate behavior . . . and noted to be calm and cooperative." *Id.* The ALJ then referred to treatment records indicating that Garcia's "mood was euthymic with intact attention and concentration and fair judgment*.*" *Id.*

The ALJ also noted treating psychiatrist Dr. Lubrano's opinion that Garcia would be absent "more than three times per month" and thus unable to sustain work activity; had "moderate" to "extreme" loss in her ability to understand, remember, and carry out instructions, and interact with and relate to others; and experienced "marked" limitation in activities of daily living, social functioning, constant deficiencies in concentration, and continual decompensation. *Id.* at 24,

483.  The ALJ found these statements to be unpersuasive when compared to Dr.

Lubrano's treatment reports and Garcia's "benign" and "stable" exams, and further

found that there was no evidence of inpatient, emergent treatment, or other reports

to support the level of impairment for which Dr. Lubrano advocated.  *Id.* at 24.

The ALJ then turned to the consultative opinions.  She first assessed the

opinion of consulting internist Eric Rosenbaum, MD, based on Garcia's September

10, 2020 exam.  Dr. Rosenbaum (much like state agency medial consultants, D.

Wallace, MD, and J. Randall, MD) opined that Garcia had no severe physical

impairments.  *Id.* at 23.  The ALJ noted that "these opinions [were] well supported

by and consistent with the objective exam findings and treatment reports, which

show[ed] benign physical exams," barring obesity.  *Id.*

The ALJ also addressed the assessment of consultative examiner Joshua

Goldstein, PsyD, who opined that Garcia had moderate limitations in

understanding, remembering, and applying simple directions and instructions; as

well as moderate evidence of limitations (1) understanding, remembering, and

applying complex directions and instructions; (2) interacting adequately with

supervisors, coworkers, and the public; (3) sustaining concentration and performing

a task at a consistent pace; and (4) sustaining an ordinary routine and regular

attendance at work.  *Id.* at 24.  Additionally, Dr. Goldstein opined that Garcia had

mild evidence of limitations: (1) "using reason and judgment to make work-related

decisions"; (2) "regulating emotions, controlling behavior, and maintaining well-

being"; and (3) being aware of normal hazards and appropriately taking

precautions.  *Id.*  Dr. Goldstein also opined that Garcia had no evidence of limitations maintaining personal hygiene and appropriate attire.  *Id.*  The ALJ found Dr. Goldstein's opinions regarding Garcia's moderate limitations with "complex direction, social interaction, and sustaining concentration," as well as Garcia's mild limitation regulating emotions, being aware of hazards, and "using reasoning and judgment with no limitation in personal care to be persuasive, as [they were] supported by the exams findings, treatment reports, and reported activities of daily living."  *Id.* (citations omitted).  She found the other limitations to be unpersuasive as they were "inconsistent with and not well supported by the overall evidence."  *Id.*

Finally, the ALJ considered state agency psychological consultants M. D'Ortana, PsyD, and M. Juriga, PhD, who each opined that Garcia "retained the capacity for unskilled, entry level work on a sustained basis with as needed contact with supervisors, coworkers, and the public."  *Id.*  The ALJ found these opinions persuasive and consistent with Garcia's stable exams and reported daily living activities.  *Id.* (citations omitted).

At step five, after considering the VE's testimony and Garcia's demographic information, the ALJ concluded that Garcia could perform jobs such as cleaner, routing clerk, and auto detailer—all of which existed in significant numbers in the national economy.  *Id.* at 25–26.  Accordingly, the ALJ concluded that Garcia was not disabled prior to July 8, 2020.  *Id.* at 26.

## II. DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner "in the district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by "substantial evidence." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"The substantial evidence standard is a very deferential standard of review." *Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir. 2022) (quotation marks omitted) (quoting *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012)). The Court "must be careful not to substitute its own judgment for that of the

Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted).  "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted); *see also Schillo*, 21 F.4th at 74 (quoting same).

"In determining whether the [ALJ's] findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Schillo*, 21 F.4th at 74 (quoting *Selian*, 708 F.3d at 417).  Based on this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g). However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

### 2. Commissioner's Determination of Disability

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357 (2d Cir. 2022). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must consider factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R.

§ 404.1520(a)(4).  First, the Commissioner must establish whether the claimant is presently employed.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed, the Commissioner goes to the second step and determines whether the claimant has a "severe" impairment restricting his ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *Id*.; 20 C.F.R. § 404.1520(d).  If not, the Commissioner continues to the fourth step and determines whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See, e.g., Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Evaluation of Medical Opinion Evidence

"[T]he ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act."  *Pena ex rel. E.R. v. Astrue*,

No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing

20 C.F.R. §§ 404.1527(d), 416.927(d)) (internal quotation marks omitted).  For SSI

and Social Security Disability Insurance applications filed prior to March 27, 2017,

SSA regulations set forth the "treating physician rule," which required an ALJ to

give more weight to the opinions of physicians with the most significant clinical

relationship with the plaintiff.  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2); *see also,*

*e.g.*, *Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004).  Under the treating

physician rule, an ALJ was required to give "good reasons," 20 C.F.R.

§ 404.1527(c)(2), if she determined that a treating physician's opinion was not

entitled to "controlling weight," or at least "more weight," than the opinions of non-

treating and non-examining sources.  *Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 588

(S.D.N.Y. 2000).

In January 2017, the SSA revised its regulations regarding the evaluation of

medical opinion for claims filed on or after March 27, 2017 (such as Garcia's claim

in this case), *see* REVISIONS TO THE RULES REGARDING THE EVALUATION OF MEDICAL

EVIDENCE, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017); and in so doing, "move[d]

away from [the] perceived hierarchy of medical sources."  *Velasquez v. Kijakazi*, No.

19-CV-9303 (DF), 2021 WL 4392986, at *19 (S.D.N.Y. Sept. 24, 2021) (citing 82 Fed.

Reg. 5844 (Jan. 18, 2017)).  "Under the new regulations, a treating doctor's opinion

is no longer entitled to a presumption of controlling weight."  *Prieto v. Comm'r Soc.*

*Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at *8 (S.D.N.Y. Aug. 6, 2021); *see*

*also Velasquez*, 2021 WL 4392986, at *19 (instructing ALJ's "not [to] defer or give

any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources" (quoting 20 C.F.R. §§ 404.1520c(a), 416.1520c(a))). "Instead, an ALJ is to consider all medical opinions in the record and 'evaluate their persuasiveness' based on the following five 'factors': (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) any 'other' factor that 'tend[s] to support or contradict a medical opinion.'" *Id.* (quoting 20 C.F.R. §§ 404.1520c(a)–(c), 416 920c(a)–(c)).

Notwithstanding the requirement to "consider" all of these factors, the ALJ's duty to articulate a rationale for each factor varies.  20 C.F.R. §§ 404.1520c(a)–(b), 416 920c(a)–(b).  Under the new regulations, the ALJ must "explain how [she] considered" both the supportability and consistency factors, as they are "the most important factors."  20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2); *see also, e.g., Russ v. Comm'r of Soc. Sec.*, No. 20-CV-6389 (RWL), 2022 WL 278657, at *6 (S.D.N.Y. Jan. 31, 2022) ("[t]he new regulations give most importance to two of the same factors previously considered to determine whether a treating doctor's opinion should be given controlling weight," referring to the supportability and consistency factors).  Evaluating "supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)."  *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (KMW) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021), *adopted by* 2022 WL 717612 (Mar. 10, 2022).  Regarding consistency, "the new rules provide that the greater the consistency between a

particular medical source/opinion and the other evidence in the medical record, the stronger that medical opinion becomes." *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(3)); *see Rubin v. Kijakazi*, No. 22-CV-4697 (PED), 2023 WL 2016300 at *22 (S.D.N.Y. Feb. 15, 2023); *cf.* 42 U.S.C. § 423(d)(5)(B) (requiring ALJ to base decision on "all the evidence available in the [record]").

The new regulations also require the ALJ to consider, but not explicitly discuss, the three remaining factors (relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion). *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "[W]hen the opinions offered by two or more medical sources about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, the ALJ [should] articulate how he considered the remaining factors in evaluating the opinions." *Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 8 (W.D.N.Y. 2021) (citing 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3)) (internal quotations removed).

"The failure to properly consider and apply" supportability and consistency "is grounds for remand." *Prieto*, 2021 WL 3475625, at *9; *see also Rosario v. Comm'r of Soc. Sec.,* No. 20-CV-7749 (SLC), 2022 WL 819910, at *8 (S.D.N.Y. Mar. 18, 2022) ("ALJ must explain in all cases how [he or she] considered" supportability and consistency); *Rivera v. Comm'r of Soc. Sec.,* No. 19-CV-4630 (LJL) (BCM), 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020), *adopted by* 2021 WL 134945 (Jan. 14, 2021) (remanding so ALJ can "explicitly discuss both the supportability and consistency of the consulting examiners' opinions"). "An ALJ's failure to apply the

20

correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)).  However, the Court need not remand the case if the ALJ only committed harmless error*, i.e.*, where the "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### c. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted).  As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111.  Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question.  Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Hum. Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law." (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999))).  The ALJ must develop the record even where the claimant has legal counsel.  *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  Remand is appropriate where this duty is not discharged.  *See, e.g., Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court.  *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006).  "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting

*Aponte v. Sec'y of Health and Hum. Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).  Still,

an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to

permit intelligible plenary review of the record."  *Pena*, 2008 WL 5111317, at *10

(internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–

61 (2d Cir. 1988)).  "The ALJ must make this [credibility] determination 'in light of

the objective medical evidence and other evidence regarding the true extent of the

alleged symptoms.'"  *Id*. (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir.

1984)).

SSA regulations provide that statements of subjective pain and other

symptoms alone cannot establish a disability.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d

Cir. 2010) (citing 20 C.F.R. § 404.1529(a)).  Accordingly, the ALJ must follow a two-

step framework for evaluating allegations of pain and other limitations.  *Id*.  First,

the ALJ considers whether the claimant suffers from a "medically determinable

impairment that could reasonably be expected to produce" the symptoms alleged.

*Id*. (citing 20 C.F.R. § 404.1529(b)).  "If the claimant does suffer from such an

impairment, at the second step, the ALJ must consider 'the extent to which [the

claimant's] symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence' of record."  *Id*.  (citing 20 C.F.R.

§ 404.1529(a)).  Among the kinds of evidence that the ALJ must consider (in

addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location,
> duration, frequency, and intensity of the individual's pain
> or other symptoms; 3. [f]actors that precipitate and
> aggravate the symptoms; 4. [t]he type, dosage,

effectiveness, and side effects of any medication the
individual takes or has taken to alleviate pain or other
symptoms; 5. [t]reatment, other than medication, the
individual receives or has received for relief of pain or
other symptoms; 6. [a]ny measures other than treatment
the individual uses or has used to relieve pain or other
symptoms (e.g., lying flat on his back, standing for 15 to
20 minutes every hour, or sleeping on a board); and 7.
[a]ny other factors concerning the individual's functional
limitations and restrictions due to pain or other
symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July
2, 1996)).

### B. Analysis

Garcia argues that the ALJ should have found her to be disabled based on
her psychiatric impairments and that this case should be remanded because: (1) the
ALJ failed to properly assess the opinion of her treating psychiatrist; (2) the ALJ
failed to consider the likelihood of her monthly absences; (3) the ALJ failed to
consider the likelihood of her side effects from medications; (4) the VE's testimony
did not constitute substantial evidence; (5) the ALJ did not properly consider
Paragraph B criteria; and (6) the ALJ failed to properly evaluate her subjective
statements. Pl. Mem. at 11–27. The Commissioner responds that the ALJ's
decision should be affirmed because (1) the ALJ properly evaluated the medical
evidence and accounted for Garcia's Paragraph B limitations in determining her
RFC; (2) the ALJ's evaluation of her subjective complaints was supported by
substantial evidence; and (3) her education level did not preclude the VE-identified
occupations. Def. Mem. at 8–29.

As discussed below, the ALJ failed to adequately consider or provide for limitations regarding the time Garcia might spend off-task or be absent from work. Because the ALJ erred in this regard and this error was not harmless, it is not necessary to reach Garcia's other arguments.

### 1. While the ALJ Adequately Developed the Record in Most Respects, She Failed to Evaluate Garcia's Potential Absences and Time Off-Task

Garcia contends that the ALJ failed to adequately develop the record because she failed to properly evaluate her treating psychiatrist's assessments. While the ALJ properly evaluated the opinion evidence of Garcia's treating psychiatrist in most respects, she failed to sufficiently "investigate the facts and develop the arguments both for and against granting benefits," prior to making a final determination regarding Garcia's potential absences and time off-task. *Sims*, 530 U.S. at 111.

### a. The ALJ Properly Evaluated Opinion Evidence from Garcia's Treating Psychiatrist in Part

Garcia contends that the ALJ did not properly consider her treating psychiatrist's (Dr. Lubrano's) assessment by finding it to be unpersuasive. Pl. Mem. at 11. As Garcia observes, an ALJ must consider all medical opinions and determine their persuasiveness. *Id.* (citing 20 C.F.R. §§ 404.1520c(a), 416.920c(a)). However, as discussed above, the rules for evaluating medical opinion evidence post-March 2017 "instruct ALJs not to 'defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s).'" *Peets v. Kijakazi*, No. 21-3150, 2022 WL 17725391, at *1 (2d Cir. Dec. 16, 2022) (quoting 20 C.F.R.

§ 416.920c(a)).  Put differently, "[t]hat an ALJ does not give controlling weight to a particular medical opinion is *not* a basis for second-guessing the ALJ's conclusions." *Id.* (emphasis added).  Nonetheless, the ALJ must not only evaluate medical opinions for their persuasiveness (based on the 20 C.F.R. § 404.1520c factors), but must also "explain the analysis of those [supportability and consistency] factors in the decision."  *Ayala v. Kijakazi*, 620 F. Supp. 3d 6, 17 (S.D.N.Y. 2022) (first citing 20 C.F.R. § 404.1520c(b)(2); then citing *Vellone v. Saul*, No. 20-CV-261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) ("[I]n cases where the new regulations apply, an ALJ *must* explain his/her approach with respect to the first two factors when considering a medical opinion."), *adopted by* 2021 WL 2801138 (July 6, 2021)).

The ALJ properly considered both factors here.  Regarding supportability, the ALJ made clear which of Dr. Lubrano's statements regarding Garcia's limitations she found unpersuasive and inconsistent with his own treatment reports (namely, the "marked" and "extreme" limitations), as Garcia maintained consistent and "stable" outpatient exams with Dr. Lubrano for nearly a decade.  AR at 24 (citations omitted).  Indeed, as the Commissioner points out, Dr. Lubrano repeatedly described Garcia as "stable" and noted that, despite her reports of suicidal thoughts and hallucinations, she often denied having (or was not experiencing) those same symptoms.  *See, e.g., id.* at 782, 807, 810, 814, 840, 867, 908, 935 (Garcia "remains stable and there is no evidence of delusions, hallucinations or suicidal ideations").  Regarding consistency, the ALJ noted that Dr. Lubrano's opinion was inconsistent

with Garcia's daily activities, her ER treatment records, and the fact that she was not in regular or consistent need of emergency or inpatient services.  *Id.* at 24.

Garcia's arguments that the ALJ "cherry-picked" from the medical record also fall flat.  The ALJ did not "inappropriately credit[]" some evidence over others to support her findings.  *Mack v. Comm'r of Soc. Sec.*, No. 20-CV-2722 (RA) (SLC), 2021 WL 3684081 at \*16 (S.D.N.Y July 26, 2021), *adopted by* 2021 WL 3683628 (Aug. 17, 2021).  Rather, she looked at Dr. Lubrano's and other medical opinions "as a whole," AR at 25, and found that despite Dr. Lubrano's more extreme position on Garcia's limitations, his treatment plan—involving monthly outpatient psychotherapy and mostly consistent medical renewals—suggested a less severe limitation.  *See, e.g.*, *id.* at 782–85, 807–09.

In sum, because the ALJ sufficiently addressed both the supportability and consistency factors in concluding that Dr. Lubrano's medical opinion evidence was inconsistent with Garcia's daily activities, she did not err in this regard, and the Court will not "second-guess[]" her conclusion.  *Peets*, 2022 WL 17725391, at \*1.

### b. The ALJ Failed to Fully Develop the Record as to Garcia's Potential Absences

Garcia argues separately that the ALJ failed to consider her potential absences and time off-task from employment, even though she found (1) Dr. Lubrano's assessments to be unpersuasive, and (2) the time off task and the number of monthly absences did not exceed the VE's opinion.  Pl. Mem. at 18–19; Pl. Reply at 4.  The Commissioner counters that because the ALJ found Dr. Lubrano's opinion unpersuasive, she need not credit his statements regarding absences and may

27

instead rely on the prior administrative medical findings ("PAMFs").  *See* Def. Mem.
at 15.  Although she did not err in assessing the supportability and consistency of
Dr. Lubrano's other opinions, the ALJ failed to adequately address his opinion that
Garcia would be absent from any job "more than three times per month."  AR at
483.

　　　Both Dr. Lubrano and Dr. Goldstein opined that Garcia had at least
"moderate" limitations in understanding, remembering, applying simple directions
and instructions; understanding, remembering, and applying complex directions
and instructions; interacting adequately with supervisors, coworkers, and the
public; sustaining concentration and performing a task at a consistent pace; and
sustaining an ordinary routine and regular attendance at work.  AR at 24.  Dr.
Lubrano further opined that Garcia's impairments were more severe, with
"moderate" to "extreme" loss in her ability to (1) understand, remember, and carry
out instructions, and (2) interact with and relate to others; as well as "marked"
limitation in activities of daily living, social functioning, constant deficiencies in
concentration, and continual decompensation.  *Id.*

　　　Taking the moderate limitations together, along with Dr. Lubrano's opinion
of Garcia's potential absences, the ALJ was obligated to address and reconcile them
with the VE's testimony when she made the RFC assessment.  *See, e.g., Santos v.
Kijakazi*, No. 21-CV-1682 (JLC), 2022 WL 4354372, at *8 (S.D.N.Y. Sept. 20, 2022)
(citing *Matos v. Comm'r of Soc. Sec.*, No. 20-CV-10686 (GBD) (JW), 2022 WL
3084512, at *8 (S.D.N.Y. June 16, 2022) (ALJ should "address the interplay

between: (1) the limitations concerning absenteeism, tardiness and being off-task identified by the vocational expert that would preclude employment; and (2) moderate limitations found by [the doctor]"), *adopted by* 2022 WL 3084404 (Aug. 3, 2022)).  The omission of any discussion of Garcia's potential absences in the ALJ's decision is particularly significant given her reliance on Dr. Goldstein's examination.  Although Dr. Goldstein did not address absences in the same manner as Dr. Lubrano, s*ee* AR at 337–41, he listed other facts that would support the conclusion that Garcia would have significant potential absences.  He noted, for example, that Garcia: (1) was hospitalized "for one [full] day" while at St. Barnabas; (2) was separately "hospitalized in Puerto Rico for overdosing on medication"; and (3) reported "passive suicidal ideation within the past 30 days," including "command hallucinations that t[old] her to kill herself."  *Id.* at 338–39.[9]  Each of these warrants further development of the record, as Dr. Goldstein's notes suggest that Garcia would potentially be absent from work at least one day per month (which is more than what the VE testified would be tolerated).

The Commissioner contends that because the ALJ's decision to discount Dr. Lubrano's opinion was supported by substantial evidence, she had no obligation to credit his statements regarding absences.  Def. Mem. at 15.  This argument ignores

---

[9] Dr. Goldstein's report also noted that Garcia's "risk" of self-harm was "not imminent" at the time of examination, but again, this fact, combined with Dr. Goldstein's other observations and Dr. Lubrano's opinions on absences, at a minimum warrants consideration consistent with the decisions in *Santos* and *Matos*.

the fact that the ALJ found Dr. Goldstein's opinions—as to Garcia's "moderate limitations with respect to complex direction, social interaction, and sustaining concentration, as well as mild limitation in regulating emotions, awareness of hazards, and using reasoning and judgment with no limitation in personal care"—"to be persuasive." AR at 24.[10]  The Commissioner further argues that the ALJ "instead relied" on Drs. D'Ortana's and Juriga's opinions that Garcia could perform unskilled work "on a sustained basis," Def. Mem. at 15 (citing AR at 24), but like Dr. Goldstein, neither doctor opined on Garcia's potential absences or time off task. *See, e.g.*, AR at 52–60.  Indeed, the Commissioner's argument overlooks medical record evidence establishing that Garcia's evaluations "appear[ed] to be consistent with psychiatric problems" which "may significantly interfere with [her] ability to function on a daily basis."  AR at 49, 68; *see also id.* at 50, 69 (finding no physical impairments but "defer[ring] to the psychologist in terms of the impact of her psychiatric diagnosis").

The Commissioner adds that, under *Smith v. Berryhill*, 740 F. App'x 721, 725–26 (2d Cir. 2019), "the ALJ was not required to identify evidence explicitly rebutting the opinions of [Garcia's] treating physicians before discounting them or rejecting them."  Def. Mem. at 15.  The Commissioner also cites *Acevedo v.*

---

[10] The ALJ also found Dr. Goldstein's opinion that Garcia had "moderate limitations in understanding, remembering, and applying simple directions and the sustaining an ordinary routine . . . inconsistent with and not well supported by the overall evidence," AR at 24, but there was sufficient evidence—both in Dr. Goldstein's report and throughout the record—to create at least a question as to whether Garcia's symptoms and treatment records supported a loss in her ability to maintain regular attendance.

*Commissioner* for the proposition that an ALJ need not repeat information in depth after addressing a plaintiff's limitations in the decision. *Id.* (citing No. 21-CV-10621 (KHP), 2023 WL 1433648 at *10 (S.D.N.Y. Feb. 1, 2023)). However, the Commissioner fails to consider (1) the requirement that an ALJ "reconcile" the opinions and other facts in the record, including Garcia's potential absences and time off-task, regardless of whether she found that they did not exceed the VE opinion*, see Santos*, 2022 WL 4354372, at *20 ("[T]he ALJ was obligated to address and *reconcile* [medical opinions] with the VE testimony."); and (2) that while the ALJ need not *repeat* information, she must still make clear the case "for and against granting benefits." *Sims*, 530 U.S. at 111.

Further, while the Second Circuit has affirmed denials of disability benefits where the ALJ "expressly relied" on consultative examiner's opinions, "treatment notes, clinical findings and diagnostic testing of record," *Heaman v. Berryhill*, 765 F. App'x 498, 500 (2d Cir. 2019), this is not such a case. The ALJ did not "expressly rely" on any one medical opinion regarding Garcia's potential absences. Nor did she discuss the medical reports and hospital records that indicated at least day-long stays. She merely cited Drs. D'Ortana's and Juriga's generalized opinions that Garcia retained the capacity for "sustained" work, AR at 24, but never assessed the number of absences or time off-task that could be included in such work. This failure constitutes legal error as the ALJ did not to fully "investigate the facts" underlying Garcia's potential absences. *Sims*, 530 U.S. at 111.

### c. The ALJ's Error Was Not Harmless

The ALJ's failure to develop the record more fully was not harmless, as additional medical opinions or other records relating to Garcia's potential absences may have changed the VE testimony.  In *Greek v. Colvin*, for example, the Second Circuit held that an ALJ's error of substituting lay testimony "for proper consideration of a treating physician's medical opinion" was not harmless "[b]ecause a vocational expert . . .  testified that [the plaintiff] could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month."  802 F.3d 370, 376 (2d Cir. 2015); *see also Anderson v. Kijakazi,* No. 20-CV-6462 (JPO) (OTW), 2022 WL 938115, at *8 (S.D.N.Y. Mar. 3, 2022) (had ALJ found portion of medical opinion persuasive, it would have been incorporated into RFC, leading to finding that plaintiff was precluded from all work), *adopted by* 2022 WL 925070 (Mar. 29, 2022).

Such is the case here as well.  Despite evidence in the medical record that might support Dr. Lubrano's estimates of three or more absences per month (or even a number between zero and three), the ALJ nevertheless failed to "address the interplay between" Garcia's possible absenteeism and her "moderate" limitations. *See Santos*, 2022 WL 4354372, at *8–9 (quoting *Matos*, 2022 WL 3084512, at *8). Accordingly, because the ALJ "should have developed a more comprehensive record before making [her] decision" regarding potential absences, *Moran*, 569 F.3d at 114–15, and because such a record may have significantly affected the VE's testimony, remand is necessary.

### III. CONCLUSION

For the foregoing reasons, Garcia's motion for judgment on the pleadings is granted, the Commissioner's cross-motion is denied, and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk is directed to mark the motion at Docket Number 20 as "granted," and the motion at Docket Number 25 as "denied," and enter judgment for Garcia.

**SO ORDERED.**

Dated: June 23, 2023
        New York, New York

JAMES L. COTT
United States Magistrate Judge